Case number 14-5138, Shelby County, Alabama, Appellate v. Eric H. Holder, Jr. In his official capacity as Attorney General of the United States et al., Mr. Ryan for the Appellate, Mr. Hull for Intervener's Appellate, and Mr. Pollack for the Appellate. Good morning, Your Honors. May it please the Court. Good morning. This case raises a core, single issue which has outcome determinative. And that issue is whether Shelby County, in prevailing in its underlying merits action, enforced the voting guarantees of the 15th or 14th Amendment. What are the voting guarantees of the 14th or 15th Amendment? Well, and that, of course, is the question. What's guaranteed? And this goes back to the whole question of the structure of the amendments, the structure of a government of limited and enumerated powers. Because those amendments don't spell out and say, here's a vote, this is what voting is, this is what you can get. What they do is they prohibit, in the case of the 15th Amendment, both the federal government and the states from taking actions that would impair the underlying right to vote. The underlying right to vote, the individual's right to vote. The individual's right to vote, but that individual's right to vote has been defined more broadly, certainly in the Voting Rights Act and by the courts, to include a right to have a meaningful vote with respect to where it counts, what's the structure into which you're voting. And certainly that's been true. Now, Mr. Ryan, it's clear, I mean, by the way, welcome back. Thank you. It seems to me that there's no question that your victory in the Supreme Court was a vindication of the state's interest in the voting process. I'm having trouble seeing how it might have been a vindication of the individual's voting rights. Can you help me see that? Yeah, because the county here is an instrument through which the individual voters exercise their right to structure the voting process. So they delegate to the county the right to say, well, how's this election going to be organized? Is it multi-district? Is it single district? Is it two years? Is it three years? This is all done through the mechanism of government by the consent of the government. But everything starts from the consent of the government. When the Declaration of Independence, which is a predecessor doctrine to the Constitution, is written, it's endowed by the creator with certain unalienable rights. And what we've always assumed is rights belong to the people. Now, the people can delegate those rights to the state. They can delegate those rights to the federal government.  Isn't it hard to argue in the history of the 15th Amendment that that was protecting some collective right of the states? I mean, in fact, it was the conduct of the states that brought about the Reconstruction Amendment. So isn't it hard to make that argument, sort of any originalist argument, that that was what was going on there? Well, I think I can make that argument. And even Judge Bates said it was ingenious, but it isn't just ingenious. It's really quite fundamental because when you look at the 15th Amendment, it has two sections, the first of which prohibits the states and the federal government, because it reads against both, from taking certain kinds of discriminatory actions that would affect voting. But the second section says that the enforcement power must be appropriately used. And the same is true of the 14th Amendment. So this case was founded on that second section of the 15th Amendment. You look at the pleading, the merits case, which you had before you before. What we said is this is not appropriate action, and therefore it goes beyond the power of the Congress under the 15th Amendment. And derivatively, because it does, then it must infringe the 10th Amendment, because the 10th Amendment is a catch-all that restates the premise that that which is not delegated and enumerated, not within the federal power, then resides back with the individual or the state to which the individual has delegated that responsibility. So that is that. I'm looking at the amendment. The only voting guarantee I see in the 15th Amendment is the guarantee not to be discriminated against on the basis of race and voting. Well, that is certainly incorporated. We've never said it doesn't do that. Well, of course it doesn't. What else? What other voting guarantee? I understand your argument about state autonomy, but that existed prior to the 15th Amendment. The 15th Amendment didn't vest the states with any new autonomy. The 15th Amendment created a new right to be free from racial discrimination in voting. It created a right to be free of certain government actions that were enumerated or spelled out in the 15th Amendment. And the basic one was racial discrimination in voting. Counsel, isn't your position stronger on the 14th Amendment than it is on the 15th? Well, the 14th Amendment covers more than voting. But with respect to voting. Well, because voting there is derived from the equal protection. And the 14th Amendment says you can only act as appropriate. And we were taking the position that the Voting Rights Act was no longer an appropriate measure, certainly under the formula. I'm not thinking of the 14th, but when the right to vote in any election, etc., etc., etc., is in any way abridged, that doesn't limit it to race, sex, etc. Correct. So it seemed to me your argument was even stronger on the 14th than it would be on the 15th. Well, yeah. In that case, I would agree that the individual's right to vote, as that has been generally expanded by the courts, was abridged in Shelby County less than until the court declared that the formula was invalid and Section 5 was unenforceable. And that was the thrust of the case. It was to return to the individual residents of the county and the county the powers that were inherent, that the right to vote existed before the 15th Amendment. Is that the argument you made? My memory was the argument was largely, perhaps exclusively, on the vindication of the principles of State sovereignty and the State's rights. I don't remember hearing much about how that would affect the individual voting rights. Well, because the party in interest here was Shelby County, so to the extent that that county was the repository and held the rights and interests. But our papers below made very clear that what the case was about was the limitation on federal intrusion. That intrusion, for standing reasons, was directed against the county. Judge Williams, in his dissent, did refer to the 14th Amendment. Pointing out that he was quoting, actually, from the Supreme Court case in Boston, that the way Section 5 had been interpreted was contrary to the 14th Amendment. And so that has to be referring to Section 2 of the 14th Amendment, as well as Section 5 appropriate legislation. Section 2 deals with abridgment of the right to vote. I have great sympathy for Judge Williams' opinion. No, but I assume Judge Williams' opinion was responding to your argument. Well, actually, it wasn't. Judge Williams' opinion was dealing heavily with the formula and whether the formula continued to be appropriate. But did Judge Williams' dissent, did his argument that preclearance forced or deprived the states of an option for maximizing minority voting because of amendments in the 2006 Amendment, that wasn't responsive to anything you argued, was it? Well, I mean, that dealt with the substantive standards of Section 5. Counsel, did you rely on the 14th Amendment or did you not? Yes, we did. And because the VRA was originally founded exclusively on the 15th, it was expanded to the 14th. To make our case, we had to show that neither the 14th nor the 15th justified the VRA in current circumstances. That was the core of the case. That's the way the Supreme Court decided the case. So you argue that the legislation was not appropriate, I think, in the meaning of Section 5 of the 14th. And therefore, beyond the power of the Congress to intervene in state affairs because preexisting, what were the rights? Who had the right to structure elections quite freely? It was the people and the states to the extent the people gave them those rights. The 15th Amendment said, yes, you can do it, but you can't do it in ways that discriminate by race. And the 14th Amendment is read to give broader federal control over that. So you have the right first. I'm struck by the fact that the 14th protection of the right to vote is not focused on race at all. Correct. So your theory, I'm sorry, go ahead. And so I guess, you know, from our point of view, what we were doing was to say the situation, Congress changed the situation by enacting and the states ratifying the 15th Amendment to give an additional set of powers, anti-discrimination powers, to the federal government, if appropriately exercised. So there's a balance in those amendments. If you go back to the legislative history of the amendments, there was an argument as to whether this should be a delegated, enumerated power. The power to run state elections could have been done by amendment to the Constitution. It wasn't because there was a tension in there. To what extent should the federal government be allowed to intervene? And if you look at a case like Oregon v. Mitchell, in Oregon v. Mitchell, the Congress said we're going to declare 18 years old as the voting age, both for federal and state elections. The Supreme Court says, well, for federal elections, you have an enumerated delegated power. You have the power to set the conditions of federal elections. You can do it, but you can't intervene against the states there and against the people who have decided, no, they want to preserve this right to people 21 and above. So that line has been drawn throughout this jurisdiction. So your theory then, I want to be sure I understand, your theory is then that this case is brought under the voting rights of the 15th Amendment, protected by the amendment, because what you're doing is you're enforcing the appropriate legislation language of Section 2, which protects the states from unnecessary interference by the federal government as it enforces the nondiscrimination provisions, right? Not only the states, but the people thereof. Excuse me, were you talking about the 15th Amendment? Yeah, well, you know what, they both have the same enforcement clause. They're word by word identical. Very similar. So your view is that the appropriate legislation, when the framers of the amendment put that in there, they were just thinking that it had to be appropriate to enforce, to prohibit discrimination in voting, but it had to be also protective of state sovereignty and autonomy, correct? Well, it had to be appropriate, meaning it had to meet the circumstances justifying the kind of intervention that was being done. Do you think that the – no, but I want to be sure. So you see the appropriate legislation as including a protection of – that's what you say in your – here. In your – it says – Your Honor, I'm not sure how brief you said that, and that's not the way we articulated it, because that preexisting right was there, and what the appropriate limitation did was say, Congress, you can't interfere with a preexisting right unless you have appropriate circumstances in which this intervention supports the first clause of the 15th Amendment. But what I was asking is whether you think that's what they were – the framers were thinking of when they put that language in there. And I'm saying I think the framers were thinking in two directions. One, what can we do to safeguard individuals against discrimination either by the federal or state government in the 15th Amendment? And second, they were saying, well, how do we delimit that power so that it doesn't become a takeover and a usurpation of the originating the right of the people through government to structure their electoral process? Do you think that we should interpret Section 2 of the 13th Amendment the same way? It's identical language. Well, I think that – I mean, we did not challenge that, and I don't know. I know you didn't, but this is identical language to what's in the 13th Amendment. I'm asking whether when Congress banned slavery and gave – we added the 13th Amendment to the Constitution and gave Congress authority to enforce it by appropriate means, that the framers of that amendment included in that protection of existing state sovereignty. Well, and I think that one could envision hypothetically cases in which the Congress has the broad power to prohibit slavery, but there may be questions. For example, in a penal system, if you require hard labor, is that slavery? And so that gets into the question of is this the right of the people through the states to adjudicate, or does the power now sweep? And so you could argue about what's appropriate in that law. And just to back up, and those are some of the voting guarantees of the 14th and 15th Amendments. And so we've got two words, voting and guarantee, and I think we're discussing what is guaranteed. But with respect – voting means with respect to voting. And first of all, that had to be put in there because the 14th Amendment deals with a whole variety of subjects. So if you said guarantees of the 14th Amendment, you'd have much broader legislation. But voting has been interpreted, if you go all the way back to Allen and the question, is it encompassed within the vote to determine whether you have a single district or a multi-district? And the answer is yes. That's part of voting, how you structure the government, how you structure the process, has always been deemed to be part of voting, making the vote effective. And so the VRA says in Section 14C. And therefore, the question then becomes when you intervene in that, do you have an appropriate basis to do it? Let me ask you – sort of move to the entitlement question a little bit. Piggy Park tells us that attorneys' fees are available for suits that vindicate the Voting Rights Act. The language of the case is vindicate a policy that Congress considered of the highest priority. Right. Help me understand how your suit could be seen as vindicating a policy that Congress considered of the highest priority when the purpose of your suit was to declare unconstitutional the means Congress had decided upon. Well, let me say this. I mean, Piggy Park dealt with specific circumstances, the enforcement of the Civil Rights Act. So it set a general rule. And the question is not, are we Piggy Park as such? It is, was it contested in this case that the Piggy Park rule would apply to a plaintiff? And we're the plaintiff. It's not a defendant case. That's a certain type of plaintiff, right? It's a plaintiff that's seeking to vindicate the congressional policies. It's a private attorney general. If you say you're four square on Piggy Park, yes. But that standard was viewed certainly by the court below, and the parties have not contested, that that would equally imply to anybody who succeeded in enforcing a voting guarantee. Now, you might say, well, that isn't quite the same thing as somebody who vindicates a statutory policy in the Civil Rights Act. It isn't the same thing, is it? But that doesn't mean the standard isn't equally applicable. And certainly the Congress standard, the Christian rule standard, so to speak, is entirely different in its facts. Well, isn't this exactly the core of Judge Bates's opinion below? His final holding is basically that your position is contrary to the statute, i.e., therefore, Congress would not have possibly authorized attorney's fees to challenge the constitutionality of the statute. And he said something like that, although he did say we were not enforcing the voting guarantees, which is fundamentally different. Well, but at the very end of his opinion, that's his final – that's the nail he puts in your coffin. And it's really easily falsifiable, and I'll tell you why. If Congress passed a statute affecting voting that was attacked under the 15th Amendment as – Why do you not – why don't you keep the 14th? Because your case is stronger on the 14th than it is the 15th. Because the 14th Amendment – Because look at the language of the 14th. It says, in any way abridged, voting is any way abridged, whereas the 15th talks about race. I'm surprised you don't hammer the 14th. I know you mentioned the 14th. Well, we could argue – I guess what I'm saying is we could argue derivatively that the 5th incorporates the 14th. The 14th, by its terms, only deals with the states, and so that's why we had focused. And so I'm just giving you an example. If Congress passed a law that could be challenged either under the 15th or the 5th deriving from the 14th, the fact that it was passed by an overwhelming majority would not put it outside the language that Congress passed in the fees provision because the person bringing the case would have succeeded in enforcing a guarantee, and here a more traditional guarantee, I should be free from racial discrimination. I'm not sure you're answering the point. Maybe I'm missing it. Let me repeat. Faith says, how could we possibly conclude that Congress would wish to incentivize an attack on the constitutionality of Congress's statute? And the answer we have given is Congress passed a clause, a – You say 14e trumps that. 14e. That's the first expression of the congressional will, and that clause says expressly if you enforce the guarantees and you prevail, you seek to, you bring an action or procedure. But, Mr. Ryan, isn't that just – aren't you just emphasizing the distinction between eligibility and entitlement? 14e is the portal through which one determines if fees, you're eligible for them, right, and that's this broad inquiry as to whether you're seeking to enforce the voting guarantees. But, Lisa, as I read Piggy Park, there's a separate inquiry now as to entitlement, and that's the question that both Judge Silberman and I were asking, and I think Judge Bates relied on. It's hard to see under Piggy Park how you're entitled to these fees because you're striking – you're seeking to strike a provision that is a constitutional provision of Congress. That's a gloss on the legislative language because the legislative language is quite straightforward. You know, if you prevail in an action or proceeding to enforce the guarantees, you're entitled to attorney's fees. Well, actually, I think Judge Griffith was focusing on the language in Piggy Park, which says that – it says that the fee provision is designed to promote private litigation as a means of securing broad compliance with the law, and the law in that case was the Civil Rights Act of 1964. And, true, let's assume you're right that you're seeking to enforce rights guaranteed by the 14th and 15th Amendment, but not through the law passed by Congress. So his point is, is that Piggy Park says – raises a serious question about your eligibility for – Well, he put a gloss on that, and he treated it as if there were two alternative standards. I mean – and the one – the other one, Christian Borg, which you applied, has no comparison to this case because it was a defense case. It didn't create any law of broad applicability. It was defended on the grounds it was untimely. There was no wrongdoing in the constitutional or statutory sense by the party against whom the fees were sought. So there's nothing about that case that compares to this one. Now, the statute – we want to be fair with the Court. The statute talks about discretion. So the question, how is discretion to be exercised? And that's what you're raising, Judge Griffith. But the premise of Judge Bates' exercise of discretion was that we were not pursuing the kind of right, the purposive kind of right. That's the word he used, purposive. And our belief is the statute doesn't say purposive right. The statute says if you enforce the guarantees, you're entitled. But Piggy Park, how do we – how would – if we were to write an opinion that you would like, how do we get around Piggy Park? I'd say that in – you know, maybe in another case, one could argue about is the bound on discretion in Piggy Park authorized? There are other cases. We pointed out Fogarty where the Court said it was even-handed. Both parties are eligible for fees. Counsel, is the structure of Title VII the same as the structure of this case? No. Title VII is, after all, a statutory enactment, and these fees were sought. You don't have anything in Title VII that's like this limitation of appropriate legislation. Right. Or language in any way abridging. You don't have something like that. No. And so the challenge – Title VII is more binary. Right. And it clearly – it's a paradigm in which somebody says the statute gives me certain rights. I'm enforcing them. The other party says no, either you can't because you're untimely or you're wrong. But it doesn't present the same kind of opportunity that this did to actually challenge itself under the language of the Constitution. And I think it's – you know, it's when the Congress enacts statutory language, that's the first and primary reference. The pluses one could put on it are different. And nobody in this case contested that a successful plaintiff who enforces a guarantee should be treated for discretionary purposes under Piggy Park. What was contested is, well, you're more like a defendant, therefore you should be under Christian Board, which we don't think has any applicability. We're not a defendant. We affirmatively sought to be protected by a guarantee that's within the amendment. We established a principle of broad applicability. And the government was a wrongdoer. The government had imposed costs on Shelby County in an unconstitutional manner. May I ask a question, a procedural question? Am I correct, reading your briefs, that you are absolutely foregoing any claim of attorney's fees against the intervener? Yes, absolutely. There's no question about it? There's no question. Forever and ever and ever and ever? And I will say this. The original motion might have been read more generally against defendants. We made clear to the district court, both in brief and expressly, that we were not seeking – And in your brief here? Yes. And we do not seek it, and we certainly respect the teaching of Zipes in that regard. And the government is fully capable of paying it. Let me say one other thing. One thing that the statute was intended to do, and it certainly comes in the legislative history, is avoid imbalance in resources. That is to say, one concern was, well, if you seek to enforce your rights as an individual, the resources are on the other side. But here, it's backwards. Shelby is less resourced because the only target – I'm not sure that's right. I don't think the federal government has anywhere near enough resources. Excuse me. Well, they may not have enough, but relative to Shelby County, they're a lot better off. But the point being that it's not an imbalance in resources. This kind of litigation – Hold me up. I just have a follow-up question to Judge Silverman's. The footnote in the intervener's brief says – I think this is a footnote. They say, although Shelby has said it's not seeking fees as a legal matter, you've taken the position that defendant-interveners are, quote, responsible parties. You disavow that, too, now? Well, what we did, we take that position, but we recognize that under Zipes, in order to be a party against whom a fee could be awarded, you have to be a wrongdoer. And we did not claim they were wrongdoers. The actions here were all actions of the attorney general, not the actions of the interveners. And, in fact, we had contested their intervention in the beginning on a mandatory basis. We kind of said, look, they're permissive and under a restriction that says you're a quasi amicus. Come one, come all. We never tried to restrict people from having their say. But we did not recognize them as an active party here. They're a philosophical party. They're no different from any other taxpayer. But since we considered that this would be a case that would involve many people, we didn't try to restrict briefing in the case, and we haven't here. Anything else? No. Okay. Thank you. Thank you. We'll hear from the intervener defendants. Mr. Coe. Good morning, Your Honors. My name is Dale Coe of the American Civil Liberties Union on behalf of the defendant interveners. We requested oral argument, as I believe Your Honors know, in response to the court's order of April 3rd directing counsel for the parties to be prepared to address the defendant intervener standing today. And we read that order in light of Shelby County's statement in footnote 12 of its reply brief, which I think we understood as the first time that Shelby County was expressly and clearly stating that it was not seeking fees against the defendant interveners. So I think we're all in agreement, at least counsel are, that the defendant interveners don't have a direct financial stake in the outcome of this dispute. But you still nevertheless get five minutes to talk as if you were amicus. Go ahead. Well, I think since the only dispute now at this point lies. Well, I have a question for you, since you're amicus. Suppose a new Congress were to pass a new version of the Voting Rights Act, which in your, I mean this is a horrible example, hypothetical, but you know how hypotheticals are, what we live by. And it was, in your view, blatantly discriminatory against minorities. You would sue under those circumstances, I'm sure, would you not? It's a little bit of a vague hypothetical, Judge Silverman, but if we believed that a new enactment of Congress violated the 15th Amendment, it's likely some party would sue. 14th or 15th Amendments prohibitions. You would sue, would you not? And if you prevailed, would you get attorney's fees? If an enactment of Congress directly violated the 14th and 15th Amendments prohibitions on racial discrimination, and the 14th only applies to the states, but is incorporated against the federal government through the 5th Amendment, then I think we would, or some party certainly probably would. Then you would be entitled to attorney's fees, wouldn't you? I certainly would think you would. If there were a violation of those amendments' guarantees against racial discrimination in voting, then I think a party could be entitled to attorney's fees. Right. Let me ask you a different type of question. Suppose, under the old Voting Rights Act, a state submitted, say, a redistricting plan that it thought was most protective of minority voting power, and the Attorney General objected. And that state sues, arguing that it's seeking to protect rights guaranteed by the 14th and 15th Amendments, and it wins. In other words, we rule that Section 5 is unconstitutional with respect, as applied to that particular submission. Would that state get fees? It's hard for me to see how a jurisdiction could obtain fees in that situation, Judge Tadel. The cases in which jurisdictions seeking, acting as plaintiffs in a case under the Voting Rights Act, have obtained fees have generally been situations where the position of their adversary has been frivolous or unreasonable. No, no, but I know that. I know what those cases are. I'm just asking about this case. Why wouldn't that state be seeking to enforce voting rights guaranteed by the 14th and 15th Amendments? Because it's, in other words, it's not arguing, as Shelby is here, maybe Shelby's right, I don't know, but it's not arguing that it's seeking to protect state sovereignty or state autonomy over the voting process. It's arguing our redistricting plan is more protective of minority voting rights than the alternative, and the Justice Department rejected it. Why isn't that a suit brought to protect rights guaranteed by the 14th and 15th Amendments? Well, I think what the jurisdiction in that circumstance, Judge Tadel, would be seeking to do would be seeking to enhance the influence or the political power of the minority community, which I think is distinct from what is protected by the 14th or 15th Amendments. Those amendments prohibit racial discrimination in voting, but don't in any way sort of seek to maximize political influence of minority communities. The 14th Amendment doesn't refer to race. The 15th does, not the 14th. The 15th Amendment, by its terms, does explicitly refer to race. The 14th Amendment has been interpreted to prohibit undue burdens on voting rights, for instance, in the Anderson verdict context in a race-neutral manner. See, I would have thought your answer to my question was, yeah, of course they would get fees, but that's not this case. I would like one other question. It's perfectly clear, is it not, that under both the 14th and 15th Amendments and the voting guarantees under the Voting Rights Act apply to non-minorities? So, Judge Silberman, the 15th Amendment clearly prohibits any kind of racial discrimination on voting, regardless of who's at issue. Now, there are provisions of the Voting Rights Act that directly protect minority groups specifically. I'm not talking specifically about the 14th and 15th now. The voting guarantees of the 14th and 15th are certainly those that would extend to non-minorities. So, if your question, Judge Silberman, is, do the prohibitions on racial discrimination in voting contained in the 14th and 15th Amendments apply in a race-neutral manner, then I believe the answer to that question would be yes. Okay. Thank you. Thank you, Your Honor. Thank you. May it please the Court. Nathaniel Pollack, representing the Attorney General. I want to talk about five reasons to reject Shelby County's argument that what it was doing in this litigation was seeking to enforce the voting guarantees of the 14th or 15th Amendments, and that's the only basis for fee eligibility that Shelby County is raising here. The first is the plain language. Grants of authority to Congress under Section 2 of the 15th Amendment and Section 5 of the 14th Amendment are not- I'm sorry. I can't hear you. Sorry. Grants of authority to Congress under Section 2 of the 15th Amendment and Section 5 of the 14th Amendment are not voting guarantees to states. The fact that the authority that is given to Congress under those sections is not unlimited does not make everything that falls outside of that authority somehow a guarantee or specifically a voting guarantee. And the second point is that- Well, that's what his argument is. His argument is that appropriate means that it has to be appropriate to eliminating racial discrimination in voting, but anything that goes beyond that would be interference in state sovereignty and autonomy over the voting process.  I understand that's his theory. Actually, I would modify it. His theory is broader than that. That something that goes beyond that bridges the right to vote as it's referred to in Section 2 of the 14th Amendment, as it extends to the states. In the 14th- So, to be clear, Shelby County has never brought an Equal Protection Clause claim on behalf of its citizens in this case. Shelby County's claim on the merits was- Well, that's not an Equal Protection Claim that Judge Silver is talking about. It's the right of the people to organize their elections according to majority rule. That's the voting right that's being referred to in the 14th Amendment, Section 2. Why isn't that a voting guarantee? It is. It is a voting guarantee. The language of the statute says voting guarantees not just of the 15th Amendment, but of the 14th Amendment. And one of the voting guarantees of the 14th Amendment, according to Section 2, can't abridge the right of the people to put their elections together the way they decide by majority rule. Your Honor, this case is about what that term means in the fees provision in Section 14e. And what I would submit is the straightforward reading of the fees provision is that the voting guarantees of the 14th or 15th Amendment are the voting guarantees that they affirmatively make, not the appropriate mislimitations on Congress's authority. And I think Section 3 of the Voting Rights Act confirms that. What about Section 2? What about Section 2 of the 14th Amendment? I keep referring to it. Or in any way abridged? Voting rights in any way abridged? For one, I don't think that's the argument that Shelby County has made. I think they've founded their entire argument on it. They do rely on the 14th Amendment. But specifically in their complaint, they rely on the appropriate mislimitations of Section 5 of the 14th Amendment and Section 2 of the 15th Amendment. Would you say, would you come out differently if they had explicitly referred to it in any way abridged? No, because I don't think that's what Congress intended by the voting guarantees of the 14th and 15th Amendment in the statute. And I think that's clear from context. From your brief, your argument is that it's an individual voting right. That's right. But what is the basis for that? Where do you get that from, that the voting guarantees of the 14th and 15th Amendment referred to in 14E are individual voting rights only? Why don't they include the voting rights of the county to organize its elections according to its own sense of what's fair and equitable and just? Well, I think that this Court can look to the context of the statute, and I would point to two things at least. Number one is Section 3 of the Voting Rights Act, which uses the same phrase to describe cases that are clearly individual voting rights cases. But it also uses the phrase voting guarantees of Section 4F2, which is a provision that provides voting rights for members of language minority groups. So I think it's clear from context. You know what puzzles me about your position? I, for the life of me, do not understand why Shelby County is not asserting individual rights. I mean, Shelby County is not an abstraction. There are human beings living there. So why, if Shelby County asserts a claim here, why is it not asserting a claim in behalf of its citizens? It's not. Individuals. Well, the rights that it was asserting are the federalism-based rights and the equal sovereignty rights that the Supreme Court relied on. And those aren't the voting guarantees that Congress was referring to in Section 14E. What is your authority for that statement? So I would point to two things. First, I think it's clear from context that when Congress was – when they talked about the voting guarantees of a particular provision or a particular statutory or particular amendment, they were talking about the voting guarantees that those – that provision or that amendment affirmatively supplies. And it also – it's – so when the statute was amended in 1975 and 14E, the fees provision was added, that fees provision originally read as it does now, the voting guarantees of the 14th or 15th Amendment. But Congress also amended Section 3, which previously said the voting – the guarantees of the 15th Amendment. It amended it to say – now we're talking – we're saying the voting guarantees of the 14th or 15th Amendment. And it's clear from context that what they were doing is saying, well, now we're going to add – because we've added these language rights provisions and those – and the 14th Amendment gives us the authority to do that. We're going to add the voting guarantees of the 14th Amendment to refer to a subset of the equal protection rights, individual protection rights that the 14th Amendment guarantees. And then finally, just the legislative history makes plain that what Congress thought it was doing in 1975 when it enacted the fees provision was giving folks whose voting rights were denied an incentive, an ability to vindicate those rights. But they didn't use the narrow language that you're pressing upon them now. They used broad language, voting guarantees of the 14th and 15th Amendment. But I think – so in the legislative history, I think it's clear that what they intended was to provide these sorts of individual rights. And it says – Congress says, for example, that fees awards are necessary. There's no question that the individual rights are part and parcel of it, but why is it – what is there in the face of the statute that would limit it to the individual rights? That's the answer. There's nothing. Now, tell me about Piggy Park, though. I think that's your stronger argument, but maybe I'm misreading Piggy Park. Well, I think that the Piggy Park – Congress legislated on the – based on the backdrop of this dual standard framework. And it's clear that Congress intended that framework to apply to this fees provision and that Congress expected explicitly that – Well, you're talking about Title VII. And as I said earlier, Title VII, it's either – it's a binary question. Either there's discrimination or not discrimination. There's no separate issue of appropriate legislation. Your Honor, I don't think I am – I'm talking about what Congress was expecting to apply to this particular fees provision. I think it's absolutely clear that Congress thought that the dual standard framework would apply, and it's also absolutely clear that they thought that – So you're saying 14E was passed in light of Piggy Park? Yes. I see. And I think that's a fair proposition. They certainly considered Piggy Park, and it does apply to some situations, but not all. Well – At least, I think. Right. So they looked at Piggy Park, and they said, we recognize that in voting cases, sometimes the parties who are really enforcing the guarantees that we're trying to promote here, the voting rights, people whose civil rights are violated, sometimes those people in voting cases are in the position of a defendant because of the way Section 5 works. And so that's expressly there, and this Court has said that in Medina. May I extend one question, if you will? Forgive me for interrupting you. You heard my question to the intervener, Dash Niekus. In the event that Congress should now address this question and pass legislation – horrible hypothetical, but I love hypotheticals – in which Congress would pass a Voting Rights Act that was discriminatory, you would be in an awkward position in that situation. But then, if the intervener were to sue, challenging him, would the intervener be entitled to attorney's fees, if they prevailed on the grounds that the new Voting Rights Act was inconsistent with the 14th and 15th Amendment? Your Honor, our position is that in this kind of a challenge, a pure constitutional challenge, what's going on is not enforcement of voting guarantees, as there would be in a Section 2 case. Why? In other words, you disagree with the intervener? They wouldn't be entitled to attorney's fees if they challenged that? We disagree with that because in a case where it's just a matter of is the statute constitutional or not, nobody's enforcing any voting guarantees. There's no question of applying the law to a particular – Congress passes a Voting Rights Act that preserves white hegemony throughout the country, and the ACLU challenges it as a blatant violation of the 14th and 15th Amendment, and you would say they're not entitled – and they win, and they're not entitled to attorney's fees? If the act is being applied to them and they're – No, no, yes, go ahead. Would they be entitled to attorney's fees under the 1975 attorney's fees? Right, so in a case – They would be. In a case like – So the answer is yes, they'd be entitled to attorney's fees. Well, no, if the case is – if it's applied to their client and there's a particular factual situation that the act is being applied to – No, they're challenging it facially. It's unconstitutional. Our position is no, but we don't think you need to get there because we think that it's – that what Congress meant by – One of the biggest arguments that Judge Bates used, as I said earlier, is that it's anomalous to conclude that a statute of Congress passed in what was 2005, 2006, can be challenged as inconsistent as one in which attorney's fees should be awarded because Congress would never have wanted someone to prevail to get attorney's fees challenging the legality of Congress's statute. I think that's enough – That's your view. You made that argument in the brief, right? Right, and I think that's another thing that this Court can look at is – I think you're talking about two different statutes, which was revealed in my conversation with him. You're talking about a 75 statute that provides attorney's fees. So we're looking at that statute as compared to what Congress did in 2000 – was it 2006? Right. So there's – so what is at stake here, and I think Judge Bates missed this, is what the 75 Congress intended. Right, and sitting in 1975, the idea that Congress was affirmatively trying to promote with attorney's fees this kind of constitutional challenge is just – it's inconsistent with the legislative history and it's also inconsistent with common sense. At every turn, you know, when the – For the peace part, right. When the Voting Rights Act was enacted in 1965, the Section 5 was – the constitutionality of Section 5 was challenged. It was challenged again when it was extended in 1970. There had been other constitutional challenges to the Voting Rights Act. So sitting in 1975, Congress – there was no problem with, well, there – we need to give people – you know, we need to make sure the constitutionality of the Voting Rights Act is challenged. That – and – That's true. Back in 1975, the 75 Congress set forth the attorney's fees, couldn't contemplate that a Congress 40 years later would, frankly, screw up, at least according to the majority. I think, though – I mean, in 75, there was another – there was another reauthorization of – or Section 5 was extended at that time. Congress had every reason to expect that every time that, you know, these things would be challenged. And so it – there's no reason to think that Congress would have thought, well, we really need to make sure, you know, people have incentive to challenge the constitutionality of the Voting Rights Act, so we're going to incentivize that, take the unusual step and incentivize that with fees litigation. I would just make one other point, which is in Allen, the case that Shelby County is relying on heavily, which, of course, was before the fees provision was enacted. But referring to this language, the guarantees of the 15th Amendment, and what it is naturally understood to mean, Allen says the Voting Rights Act was drafted to make the guarantees of the 15th Amendment finally a reality for all citizens. That's not a statement that brings to mind Section 2 of the 15th Amendment and the appropriate mislimitations found therein. So I submit that the natural reading of the language of 14E is that it – is that it's trying to get at individual voting rights. And even if this Court disagrees with me on that, it should look at the Piggy Park-Christiansburg standard that Congress was legislating against the backdrop of and conclude that, really, to get at what Piggy Park requires, to get at Congress's intent. One other question, counsel. You agreed with the intervener that the Voting Rights Act, as well as the 14th and 15th Amendments, certainly protect non-minorities as well as minorities. Yeah. Thank you. Suppose – I just have one more question because I just want to be sure I understand the government's position here. Suppose it was really clear in this case, for whatever reason, that this case was broad, that this was a case to enforce the voting guarantees of the 14th and 15th Amendments, either because of Section 2 of the 14th Amendment or because of their theory about appropriate legislation. Let's assume that's the case. Your position is that they still wouldn't be qualified under Piggy Park, right? That's right. And that's because they aren't enforcing the statute as written by Congress. Correct? Yes. That's your position. And what Piggy Park requires specifically is that the party be the chosen instrument of Congress to vindicate the policy that Congress considered the highest priority. And that's talking about the policy that it was considering when it was enacting a fees provision. So why did Congress enact a fees provision? What was it trying to accomplish with that? I submit that it was certainly not trying to accomplish incentivizing of constitutional challenges. What it was trying to accomplish was incentivizing individuals whose voting rights were violated, giving them the ability to enforce those rights. Okay. Thank you. We used Mr. Ryan. I think we used him. Would you like two minutes? Thank you, Judge. I just have to extend it. Your Honor, you raised, Judge Tatel, a question which is comparable to Ashfors versus Georgia, a case in which Georgia believed that its redistricting maximized the opportunity for minority participation in the legislature, and the federal government did not give it free clearance and challenged it. I'll just point out to you in that case when Georgia prevailed, the Justice Department settled with them and paid fees. So recognize at that point that they had established a limitation of principle which met your hypothetical. So I think at least that's one kind of historic example that this wasn't taken so narrowly. And, Judge Griffith, on the piggy part point, which I think is important to you and I think important to the Court, if you look back at legislative history, the Congress kind of said, well, you know, we want to ensure that people are not deterred from asserting their rights, and therefore we're granting them post-Aliaska. Because in Aliaska, the Court said we can award rights to people who confer public benefit, and we could have argued about that. The Supreme Court said, no, you can't. Congress responds and says, okay, then we'll provide it by statute specifically. So they do. And they say, well, you know, one good incentive is not to be too restrictive with discretion. It should be exercised only in special circumstances where someone has prevailed. No one argued special circumstances here. So it's the general standard that Congress chose. What about this litigation? Well, this litigation is not alien to the Voting Rights Act. It was, in fact, founded jurisdictionally on the Voting Rights Act because Section 14B, Congress made express provision for constitutional litigation, and the purpose was to resolve the question, what's the limit of appropriate? Have we gone too far or not? Congress also created a mechanism. It sunset the coverage formula each time. That was Congress's way of saying, you know, we recognize that this may be gone too far. We'll periodically revisit it. And they did each time. They revisited it and kept it going. So Congress had in mind a way to address any problems that would arise with the coverage formula. They just didn't think there were any problems. So it seems to me a bit of a stretch to say, under the language of Piggy Park, that Congress, having created that mechanism to revisit the coverage formula periodically, also wanted to incentivize parties to challenge it in the courts. That seems inconsistent. One way of Congress supervising the Voting Rights Act was reenactment periodically. Of course, they started to extend that to 25 years. But they did it. They looked at it and they reenacted it. I understand. But that's one way. The other way was Congress recognized there was going to be a constitutional challenge. And it said, we're going to order that challenge. We're going to put it in the District of Columbia because, as was testified at the time, this would be a valuable thing we ought to find out, not what we think and not how we consider the record but how the courts consider the record. So we're dealing with legislation that was expressly contemplated and is, in fact, authorized by the statute. Now, the gravamen of the complaint is about what's approved by the statute. It's hard to make that argument that after so many times of reauthorizing the coverage formula that they are sitting there waiting to find out what the courts have to say, whether the coverage formula is constitutional. Maybe in the first instance, very much so. But when you have the long track record, that just seems to be hard to do. To be fair, in the first instance, they were more concerned with letter preclearance as such. Right, right. It was authorized at all. Right. But as it went on, it was clear people were challenging whether it should be applied here, whether it should be applied here, whether it had to be applied uniformly. Certainly by 2006, Congress was well aware there was going to be a challenge on that formula because it antiquated. And politically, they decided they just didn't have the wherewithal to change it. But remember, this litigation not only set aside the formula as it exists, but it certainly indicated to Congress, if you want to bring it back, here's the kind of thing you find. So it did a public service in that regard. It did what Congress wanted. It spelled out the boundaries of what's appropriate. So I think in that regard, there's a justification for public benefit coming from this litigation. And again, as you pointed out, the statutory language doesn't talk about purpose. It doesn't incorporate this concept individually. They could have written that. You could have written a statute that says where an individual seeks to attack discrimination under the Voting Rights Act or the amendments directly, you'll be entitled to peace. But that's not what it says. It talks about a proceeding, an action or proceeding to do just that. This was the action or proceeding. We prevailed. And I think that there was no challenge to our argument that if we prevailed in that kind of case, then Piggy Park was the governing standard. Now, whether you could challenge it in some future case or not and say the discretion might be broader as it is in the copyright area is a different question, but it wasn't preserved here. Okay. Thank you. Thank you.
judges: Tatel, Griffith, Silberman